The next matter is the estate of James Oscar Smith and others v. Aubrey Drake Graham and others. Good morning. May it please the court. I'm Robert Clarida. I'm representing the plaintiffs' appellants, the estate of James Oscar Smith et al. I'm seeking reversal of the grant of summary judgment below. I would like to reserve two minutes for rebuttal. I do so. If the court would like some factual background, I'll be happy to spend a minute on that. Otherwise, we can get straight into why we believe the district court committed reversible error here. You should assume we read your briefs. Yes. All right. Then I'll just outline the facts that will be particularly relevant to the discussion. This is a copyright infringement case. The plaintiff's work at issue is 67 seconds long. It was commercially released. It's an expressive work. It's creative. It's registered with the Copyright Office. The district court correctly found that it's a work of protectable authorship. In 2013, the defendant, professionally known as Drake, copied large amounts of that text onto a commercial recording that he released called Pound Cake. The use is about 35 seconds long. It's about 54 percent of the original work. Drake added nothing. It simply consists of the words that Jimmy Smith spoke. There was music added in the background, wasn't there? There was addition. That was to the sound recording. And there are two separate copies here, two separate copyrights. You're saying in terms of the lyrics alone, the text. The lyrics. Because the performance was licensed and the text was not. The recorded performance was licensed. The text was not. So we're talking only about that. And we're talking about whether essentially this was or was not fair use when there was a certain reason for him to make the change. But why did he have to use all the rest of the stuff that he used? That's a very, very good point, Your Honor. Because there was a change that the district court found to be significant in the alleged message of the Jimmy Smith rap. And found that change to be sufficiently transformative that all the additional copying was fine. Changed the whole meaning of, changed the whole substance of the first recording, didn't it? No, we disagree with that. There's actually not just one message in the Jimmy Smith rap. There's more than one message. If you actually look at the lyrics and they're in the joint appendix of JA 264, and I understand the defendants will have a chart of that. There are several topics that Jimmy Smith discusses. And he has, as we discussed in our briefs, a lot of it consists of reminiscing about, oh, back in the day we used to do it this way. And I got together with my friends and so on and so forth. That meaning isn't changed at all. It's just used wholesale for its own expressive value. And the closing of the Jimmy Smith rap talks about we hope you enjoy the record, we had a ball making it. That's not changed at all. What changes in the middle is that there's a portion of it that lasts very briefly, it's under ten seconds, where Jimmy Smith says that jazz is the only real music that's going to last. Isn't that the heart of the whole quote? No, it's not. The Jimmy Smith rap is not the Gettysburg Address. It's not all driving to that one point. It's just a sort of a collection of miscellaneous recollections and observations by Jimmy Smith. There's not one message. And I think the district court below made a reversible error by assuming that to be the case. Why does Jimmy Smith have to take all sorts of reminiscences about making, Drake have to take all these reminiscences about making the record? What does that have to do with whether jazz is or is not the best form of music? Basically, Jimmy Smith said X, Y, and Z, and Drake said X and Y. Left out, he doesn't mention hip-hop, he doesn't mention jazz at all. If this Drake version were put on a jazz record, it might well be referring to jazz. Merely putting it in the context of a hip-hop record, as this court said in TCA Television, is not enough to make a transformative use. There, as you may remember, there was an Abbott and Costello record, Abbott and Costello comedy routine that was put into the context of a play that was a pretty dark play, as the court observed. But the court said merely putting this into a context where it may take on some different resonance is not enough to make a transformative use that we're bound to consider sufficient to overcome the extent of the taking. And a smaller taking here might have been a fair use. But the test always, as the Supreme Court says in Campbell, is whether the transformative purpose will reasonably be perceived. What was the point of the part that was not changed being included? Was it there to give context to what was a change, in which case it looks transformative? Or was it there for no reason except the guy was copying? I mean, that's the question we really have to focus on and to decide whether that's a question for us to decide or for a jury to decide in these cases. That's what I'd like you to address because I keep going back and forth. The purpose of the copying over and above the part about whether jazz is the only real music, it was simply, as the Supreme Court said in Campbell, to avoid the drudgery of working up something fresh. It was interesting. It was colorful. It was entertaining. It was put on the Drake record for that purpose. A reasonable jury could so conclude, I'll say that. And there's no evidence in the record about what Drake's purpose was. And there's no evidence in the record that anybody who ever heard the Drake version thought it was a critique about jazz or a critique about the relative merits of different kinds of music. But yet somehow the district court found that that's all that the Jimmy Smith rap was about. And that's simply not the case, and no reasonable juror would hear it that way. Well, it was certainly a very dramatic part. Well, because it has a four-letter word in it, and that makes it colorful. Come on now, we've heard enough of those. That isn't really going to... What was dramatic was a question of what is music and what is not. Right, and Drake does not address that. He simply says all real music will last and everything else will be as... Yeah, but we know from his point of view, what he's saying there, that it is not jazz, but the kind of rap that he is doing. I mean, that I think is quite clear. What music, he says? Beg your pardon? Doesn't he say good music, real music will prevail? Yes, and that came straight from Jimmy Smith's mouth. Jimmy Smith said... Really, because Jimmy Smith says only jazz. Only jazz is real music, and real music will prevail. Drake doesn't say what only real music is. He offers no opinion about that. He merely subtracts. He doesn't add. As Learned Hand said in 1936, Sheldon B. Metro-Goldwyn-Mayer, no plagiarist can excuse the wrong by showing how much of his work he did not pirate. All Drake did was subtract. He didn't add anything to this message. But you think it would be different if he had said the only real music is rap? I think that would have made the message much clearer. The transformative purpose could reasonably be perceived much more clearly in that case. When I say the only real music is Cole Porter and the Doily Cart, that would be okay? Everything else is bullshit? Well, as long as Drake doesn't say what's real music and what's not, the listener is never going to know that it's a critique. The listener is just going to hear the Drake statement. It sounds like a nice innocuous statement that real music will last. How is the listener ever going to know? This is like Rogers v. Coons with the String of Puppies photo. How is anybody looking at that photo going to know that it's a reference to this other published photo out there? It's just a photo of a sculpture. You don't really have to. We've said outside of parody, if it's parody, then you need to know what work is being commented on. But in other contexts where there's transformative use and there's comment generally that can be infirmed, I think one might be able to from the sequence of music and the development of the text in the overall work, that there is a comment going on about what music will endure. So we don't require an explicit reference. That's only inferring from context, Your Honor, which this Court in TCA television said was not enough to make it transformative. TCA actually distinguished Cariou v. Prince, which is a case that recently decided by this circuit and took a large step away from prior case law on this. And TCA distinguishes Cariou and says we don't have to get into whether Cariou is right or wrong, because we can just look at what happened in Cariou, the works that were said to be barely recognizable, where the plaintiff's work was barely recognizable in the later work. Those were fair use as a matter of law. But TCA specifically says here the plaintiff's work is not barely recognizable. We don't apply Cariou. We actually have to look at what was done to change the plaintiff's work and what is the commentary. Is there any inference to be drawn from the fact that a license was procured as to the performance as the recording itself? Well, I think that is the custom in the music industry is that you get a license for the composition, you get a license for the recording whenever you're doing a sample. The fact that a license was procured means that someone was trying to get the rights they needed to have to release the record. It's absolutely standard practice. Certainly there's no inference that can be drawn either way from it. It's just a practice of how it works. If Drake and the others had searched at the time they published this, they wouldn't have found any registration, correct? Well, they could have done what Mr. Hacker did, which is to ---- It certainly shows a matter of good faith. Well, good faith may or may not be a factor under the fair use analysis. Certainly bad faith can hurt the defendant. Good faith can't help the defendant under the law of this circuit in fair use. But they hired a clearance agency to go get the licenses they needed for the samples on this record, and that clearance agent should have done what Mr. Hacker did. He said, oh, I see Jimmy Smith. I'll go find that estate. And the clearance agent surely could have done that. And the fact that they didn't doesn't give anybody innocent infringer defense. They did search and found no licenses, no registration, correct? Correct. But the copyright attaches upon creation of the work in a tangible medium. It doesn't need to be registered. That happens every single day that copyright unregistered copyrights are infringed by third parties. And those copyrights are just as enforceable once the registration has been obtained. All right. All right. Thank you. You've reserved two minutes. Two minutes. Thank you. For rebuttal, we'll hear from the appellees. Good morning. May it please the Court. Christine Lupera, Mitchell, Silverberg, and Knopp. I'm arguing today on behalf of all of the appellees. Let me address the first factor of fair use, which I think was the Court's focus in connection with the use here in the Drake piece of what we've called the Jimmy Smith rap. And as the Court has recognized, there was a licensed recording of the performance of the words by Jimmy Smith credited on the app. I'm going to interrupt for just a second. Yes. This is in the appendix at JA-264. Is that correct? The record, yes, Your Honor. It's difficult to see from here, and it's already in the record, of course, so this doesn't particularly assist. To the extent that helps, maybe. And the reason I'm doing this is because I would like to address the issues that my colleague has raised with respect to both what has been altered and what has been taken. As I think the Court has noted, what Mr. Graham did here is very significant. It took Jimmy Smith's absolute disdain and hate for popular music, which is admitted in the record. There is no dispute that the heart of his rap was to say jazz is the only real music that's going to last. The rest is garbage. The tone in which he speaks these words is not really consistent with your tone right now. I mean, this is a reminiscence and a comment. Right. But you're adding a fair amount yourself. I am. But what I'm doing is I'm reading from the record with how the actual appellants expressed the disdain. All this still does not explain to me why your client took all the rest of this. Okay. I mean, if what he wanted to say was it ain't just jazz. Right. It's all sorts of other stuff, and indeed it isn't jazz. That's fine. But why copy the rest? So this is why I have this up here, Your Honor, to address that very point, because the cases are clear, and obviously we have a very short piece here, and I'll get into the license issue in a minute. But we have a very short piece here, and you can see that there's significant amounts that were not taken whatsoever that deal with the actual off-the-top recording. What you have is a transposition down to the bottom of the heart of it, which is the jazz quotation, and it's changed to now say real music is what's going to last, and meaning not just an exclusionary. Why does he need to take anything else? So here's where I'm going with that, Your Honor. When you're talking about the yellow portions here, the good God almighty, back in the old days, and you're talking about having a ball, if you were to simply just have all real music's going to last, not in the context of talking about a recording process. Our recording process is simply as important as, you know, we revel in it, too. We drink champagne. This wasn't Mr. Graham's recording process. It was Mr. Smith's. No, the whole point of this whole commentary is that it's anyone whose real music is their recording process, not just the jazz greats. I see. And the point also, which I think is to some extent obscured, and there's a lot of disdain in the appellant's brief with respect to the Poundcake song as a whole, but what you have in the Poundcake song are innumerable references to what's known as hip-hop royalty. There's a litany between Jay-Z and Drake back and forth about all of the various people in that genre who have contributed to the fame, and they're actually reveling in the balance of that rap recording in that genre and the celebration of it. So we submit that the alteration is sufficient to have created a new meaning and message of this work under the first factor of the heart of it, which is the jazz point. It's a critique. It is actually at the core of everything that all of the courts have said. It's distinguishable from McCullen. I know we've decided on many fair use cases on summary judgment, but there are elements of this that make me think that a jury might be better suited, a well-instructed jury could sort this out, look at the whole recording, look at the full text, and then decide. Your Honor, I think the question would be whether there's any issue of disputed fact here, and there is not any issue of disputed fact with respect to what has been taken, what has been altered, and the meaning of the ---- Well, but there is an issue, a dispute, as to why that previous part was put in, whether it was put in for the reasons you tell us or whether it was those reasons are not sufficiently believable and that what was going on was that the person was taking the whole thing. Now, the argument could be made that that is a factual question that a jury should be the one to decide. When you are looking at the two works side by side and assuming you have the reasonable perception, as the cases say, with respect to what the alteration means, which is you have an exclusionary message, which is jazz is the only thing that matters, and you have the inclusionary message about real music, and then you look at the balance. Is it reasonably related to that message? And since it's about the creation of real music, it can be discerned from a side-by-side comparison, and it can be discerned from the face of it on the context. And I think the other thing that factors significantly into this first factor issue is the fourth factor issue and the market harm, and going back to the issue of the license that we've been hearing about and how it is something that should have been looked at and done. Well, the reality of the situation is there's admissions in the record. It is undisputed that these short, less than two-minute spoken word pieces do not get licensed. It was not even licensed on off the top. It has never been monetized. It has never been of any value. So when you look at the fourth factor, what you have here is an effort to make a litigation market out of something that has had no economic value, current, past, or potentially in the future. There's no derivative use for this in a sample context because you do not license it. Mr. Hacker, the Hebrew hustle principal who embarked on this pathway to go find the heirs, track them down, sign them up so he could monetize this, has admitted he had no interest in publishing it. He didn't do anything with it to sell it. He only sued. So the fourth factor, Your Honor, with all due respect, talks about the potential market for the work. And there is no potential market for this work. And all the appellants have done is attempt to create a sample market generally, but you have to focus on the work specifically in the fourth factor, and I believe with all due respect not a generalized sampling market, because clearly there's a sample market out there. Then I come back to the second and the third factors, which although typically don't outweigh the first and the fourth, which I think weigh heavily in our favor, but the second and the third factors I think weigh significantly in our favor as well. And Judge Pauly sort of passed on the second factor, but if you look at the actual substantiality and value of the part of the taking that's not the altered part, the part that talks about good God almighty, like we had a ball, these are largely cliches. They are not in any way something like analogous to the Salinger letters or of a hugely creative expression. They are factual in nature to some extent. So it's a thin copyright at best. So I think the second factor significantly weighs on our side as well. Then the third factor I did address to some extent, but I'm happy to go through it. I think the balance of the taking, if it was simply just all real music's going to last, and that was the intro to the rest of Pound Cake, the message wouldn't be conveyed as significantly as taking the words out of the mouth of the author who did disdain any genre other than jazz, have him explain about how fabulous this recording process is, but then say it's only about jazz. But it's not only about jazz. And the point is very poignant because you're dealing with two different African-American cultures in the music business, the first and foremost being the elder statements in the jazz world who had, it's admitted, this disdain for this type of music. It would not have ever licensed it even if it was asked, but ultimately it never had to be licensed as they've admitted. It could be used without money. It's never made money. It was not even licensed for money on the original recording. So you take the words out of the mouth of the advocate for jazz only, who hates hip-hop and other music, and you have him say the opposite. If that's not a fair use critique, I'm hard-pressed to say what could be, because it does show who it's taken from. The credits are on the album. This is not something obscure that's not locatable like in the Rogers versus Coons case where the puppy was just basically done without any notice. They took the copy. Rogers showed that the copyright registration was taken off of the postcard, and ultimately it was a puppy that was there. And this is all pre-Carrieu and pre-Campbell, frankly. And so what you have is you have this very specific body of law that's developed, and it's poignant because it talks about altering something original with a new meaning and message. That's what happened here. It is a very different message. It's the opposite message. It's like, no, not jazz music, not only jazz music. Our music's not garbage either. And we have the same process. So you're saying your process is this sterling, fabulous thing where you do it. You do it as you want to. You just go in the studio and you do it. Well, so do we. And you basically have taken on, you know, we've taken a situation where, you know, he has extracted only the components of this very short piece. And as Judge LaValle says, if it's short, if there's a reasonable relationship, the parsing should be careful, because all you have to show is a reasonable relationship once you've found the core of the alteration. Thank you. And, yes, in conclusion, Your Honor, we respectfully request that Judge Pauly's decision be affirmed on the ground that this is a fair use under all four factors. And similarly, we suggest that to the extent the Court's inclined, we have an equitable estoppel argument as well, which we think is very compelling under the facts of this case. And there's not a situation where, you know, the question is looking at, once again, the way this was created in terms of the copyright that never existed before. Has our Court written about sampling before? Has your Court written? No, Your Honor. And I think it's very important to distinguish this from a recorded sample or anything similar to the extent we're dealing with something that, and this is something I do want to mention this, because there's a confused discussion about Section 115 in the appellant's brief. Section 115 deals only with non-dramatic musical works, a compulsory license of non-dramatic musical works. They have admitted in the Statement of Undisputed Facts, this is not, there's no music here, Jimmy Smith piece. It's not a music work. It can't be deemed subject to a compulsory license, and certainly can't, even if it was a musical work, which it's not, because it's derivative and it's excerpted. You can't, the 115 statute applies to covers. So, for example, if I wanted to go and record a Bette Midler song that had been previously recorded and do my own version, I can get a compulsory license because there's music and there's words in it. It's very different here, which also compels us to the point of how this was concocted to be a copyrightable work of value when it's not, and it's not your typical sample, and there's no evidence in the record whatsoever of any use or value beyond this case.  Thank you, Your Honor. Thank you. You've reserved two minutes for rebuttal, counsel. Yes, just to briefly address some of the issues that my colleague just spoke to. First of all, the credits are completely uninformative on this record. This is in the joint appendix of JA-324, and the way this particular Jimmy Smith rap is treated in the credits is very different and very inconsistent with the way other sample licenses are treated in this recording, in the credits for this recording. And particularly it says after this featuring samples from Jimmy Smith rap produced under license, et cetera, it says speech sample provided by Christian, Rich, and others. I have no idea who that is. It has nothing to do with Jimmy Smith and what that speech sample credit is doing next to the Jimmy Smith rap. I have no idea. No one reading this credit line would know who Jimmy Smith was. Also, unlike the credit above it, which gives a credit line as performed by L.A. Goulding, the Jimmy Smith rap doesn't have it as performed by anywhere. So the person reading this is just going to get a credit for the sample of the sound recording, which was licensed, but they're not going to get any credit at all for Jimmy Smith or his performance or what the speech sample is. This credit provides no information whatsoever. Also, there is a disputed fact question, particularly about what is the heart of this Jimmy Smith rap. Certainly that's a question I think reasonable jurors could differ about. That is a disputed fact question. Also, it's important to look at the fact that there is no record support whatsoever for the contention that somehow this describes Drake's recording process. There's no factual record whatsoever about Drake's recording process. We don't know how much of this pertains or doesn't pertain to Drake's recording process. You would have to? Well, that's her argument. That's when Judge Calabresi says, why do you need to take all of this? And she says, I thought, if I misstated, forgive me, is that this was generic recording practices. That's how people did it. I don't think it was unique to Drake, but if I'm wrong. Well, she was talking about a reasonable relation to the core of the work, and that was her whole argument. What she's saying is that when James Smith wrote it down, it was also generic. Well, actually, I think that's a disputed fact question, too. I think it's quite unusual that James Smith had champagne from the label in the recording studio. I don't think that's very often how it worked for him. But in any event, that whole passage about the recording, even if it does apply to Drake's process, this court in the Authors Guild v. Google case, the 215, says that a second author can't quote wholesale from a prior author merely because of how well the original author's expression would convey the new author's different message. So you can't just take it because it also expresses something that's true about you. That's just avoiding the drudgery of working up something fresh. That's not what the Supreme Court allows under Campbell. Also, I think there's a fact question about how believable is this explanation about why Drake took all of this copying when he only was referring to the point about jazz to the extent he was referring to anything having to do. No one listening to this Jimmy Smith rap would know that it has anything whatsoever to do with the message that Drake is giving. The cliches that my colleague mentioned, the cliches constitute about 20 words. It's never itemized in the record anywhere. But good God almighty, back in the old days, yeah, okay, those are cliches. Take them out. You still have a very large, extensive amount of copying here. So the cliches really don't change the analysis at all. It goes from maybe 54 percent of a copy to, you know, 47 percent of a copy. It's harder to protect under copyright if they're cliches that everyone knows. Well, that's true. And I'm saying even take the cliches out. The amount of copying is still vastly disproportionate to the message that Jimmy Smith, that Drake is allegedly turning this Jimmy Smith piece into. Thank you. Thank you. Thank you both. Thank you. You can remove the demonstrative evidence if you would be kind enough to do it. Thank you for tolerating. Thank you.